IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MONTFORT SQUARE SHOPPING   §
CENTER, LTD.,   §
  §
                    Plaintiff,   §
  §   Civil Action No. 3:10-CV-1673-D
VS.   §
  §
GOODYEAR TIRE & RUBBER   §
COMPANY,   §
  §
                    Defendant.   §

MEMORANDUM OPINION
AND ORDER

    In this environmental cleanup case, plaintiff moves for partial summary judgment on

certain elements of some of its statutory and common law causes of action.  The court

concludes that plaintiff has met its burden as to some, but not all, of the issues and claims

on which it moves for summary judgment, and it therefore grants the motion in part and

denies it in part.

I

A

    Plaintiff Montfort Square Shopping Center, Ltd. ("Montfort") is the owner of a

shopping center located at 13305 through 13331 Montfort Drive in Dallas ("Shopping

Center").[1]  The property on which the Shopping Center is located was purchased as

---

    [1]In recounting the factual background, the court summarizes the evidence in the light
most favorable to Goodyear as the summary judgment nonmovant and draws all reasonable
inferences in its favor.  *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869,

undeveloped real estate in approximately 1971. Within approximately one year of the purchase, Montfort's predecessors entered into a lease ("Lease") with defendant Goodyear Tire & Rubber Company ("Goodyear"). The original Lease was amended on August 24, 1994 ("1994 Lease Amendment") and again on November 30, 2008. The court will refer to the original lease, the 1994 Lease Amendment, and the 2008 Lease Amendment, collectively, as the "Lease." Under the Lease, Goodyear operated an automobile repair center and retail store ("Service Center") at 13331 Montfort Drive from 1973 until 2008. Goodyear remained Montfort's tenant until it purported to terminate the Lease effective February 2010. During the Shopping Center's existence, Goodyear has been the only tenant in the space used for the Service Center.

The service and repair area of the Service Center included eight service bays, each equipped with a hydraulic lift for performing service and repair work. Each hydraulic lift system included a below-ground storage tank that held petroleum-based hydraulic oil. Goodyear also maintained other oil storage units at the Service Center, including units that stored unused fluids and waste fluids. Specifically, from approximately 1973 until 1993, Goodyear used a 550-gallon underground storage tank ("UST") to store waste oil from vehicles. Goodyear also used a 250-gallon aboveground storage tank ("AST") to store waste oil and another 250-gallon AST to store oil that had not yet been used on vehicles. The AST for unused oil was installed at the outset of Goodyear's operations in 1973, and the 250-

_____

870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

gallon AST for waste oil was installed in the mid-1990s.  Both ASTs remained in use until Goodyear ceased operations in 2008.

In June 1993 Goodyear removed the 550-gallon UST used for waste oil.  According to Montfort, Goodyear determined that the soil under and surrounding the UST was contaminated with petroleum hydrocarbons, volatile organic compounds ("VOCs") (such as benzene, ethyl benzene, toluene, and xylene); and several metals (including lead).  Montfort also alleges that free product (i.e., oil) was observed in the excavation area where the UST had been located.  Goodyear asserts that, based on the discovery of certain soil contamination, consisting of total petroleum hydrocarbons ("TPH") in excess of minimum target limits of 100 mg/kg in the UST pit, Goodyear reported a release of TPH to the Texas Natural Resource Conservation Commission ("TNRCC").  According to Goodyear, the target cleanup concentration of 100 mg/kg represented a conservative, generic target level based on then-applicable Petroleum Storage Tank ("PST") Program[2] guidance.

Between October 1993 and March 1994, Goodyear excavated the UST pit, at least four times removing contaminated soils from around the pit.  In April 1994 it conducted a subsurface investigation, installing and sampling 11 soil borings to determine whether all contaminated soils had been removed.  Based on the results of the investigation, Goodyear conducted another excavation action to remove impacted soils not previously removed.  Soil was excavated until all tests reflected TPH levels below the target cleanup requirement of

---

[2]The PST Program was created by the Texas Commission on Environmental Quality.

100 mg/kg or until visible "clean rock" was encountered at the base of the excavation.  After

completing the excavation, Goodyear sent the TNRCC a report detailing its cleanup efforts

and requesting closure of the UST removal.  In response, the TNRCC stated [in a November

1, 1994 letter] that Goodyear had satisfied its cleanup standard and that "no further action"

was necessary.  D. App. 188.

In 2008 Goodyear commissioned a Phase I/II Environmental Site Assessment

("ESA") in connection with plans to surrender possession of the Service Center to Montfort

at the conclusion of the lease term.  The ESA identified seven in-ground hydraulic lifts as

the only recognized environmental conditions at the Service Center.  Goodyear then

conducted a subsurface investigation by installing soil borings adjacent to each in-ground

lift and collecting soil samples from each boring.  The soil samples registered contaminants

such as the metals arsenic and lead and the VOCs toluene and xylene.  According to

Goodyear, however, only one sample contained detectable TPH concentrations, and these

concentrations were below the levels established under the PST Program for determining

whether a cleanup is required.

When Goodyear removed the seven in-ground hydraulic lifts and excavated the area

around the bay of the eighth lift ("Bay 4"), the excavation revealed detectible but minor

amounts of hydraulic oil and TPH concentrations in Bay 4.  Montfort alleges, and Goodyear

does not dispute, that groundwater samples collected in connection with Goodyear's removal

of the hydraulic lifts showed the presence of hydrocarbons; various levels of metals (such

as arsenic, barium, chromium, selenium, and lead); and other contaminants (such as the VOCs acetone, carbon disulfide, ethyl benzene, tetrachloroethene, toluene, xylene, 1,2,4-trimethylbenzene, and 2-butanone). Montfort also asserts that groundwater was found in the excavation areas at the former locations of two underground tank holds that housed service bays 1 and 4, and that a sheen of oil was found in the excavation area that corresponded with Bay 4. Finally, Montfort alleges that the inside of one of several subsurface drainage pipes was coated with a black, oily grit that Montfort alleges had no other known source or origin other than the products that were used and spilled in the service area during Goodyear's operations. According to Goodyear, however, all concentrations of hydraulic oil and TPH were below the PST Program action levels and Goodyear reported its activities and findings to the PST Program.

Montfort asserts that, although Goodyear excavated the soil surrounding the hydraulic lifts and corresponding storage tanks when it removed them in 2008, it did not remove the excavated soil, but instead returned excavated soil to the ground near the former service bays.

In July and November 2009, Goodyear conducted additional investigative activities in response to comments received by the Texas Commission on Environmental Quality's ("TCEQ's") PST Privatization Contractor. According to Goodyear, with one exception, the additional tests revealed no chemicals of concern, including VOCs, polycyclic aromatic hydrocarbons, TPH, or metals at or above specified PST action levels or the residential

- 5 -

protective concentration levels of the TCEQ Texas Risk Reduction Program.  Goodyear maintains that arsenic was the only chemical of concern originally thought to have been detected in concentrations exceeding acceptable levels.  It contends, however, that the arsenic concentrations were consistent with naturally-occurring arsenic concentrations in the area of the Service Center and, in any event, were far below any applicable cleanup standard. Goodyear posits that, when the water in the excavation area in Bay 4 was pumped out and allowed to re-accumulate on two occasions, neither light non-aqueous phase liquids nor sheen was observed on either occasion.

Based on its 2009 findings, Goodyear requested the TCEQ to approve closure of the Service Center location under the PST Program.  In 2010 the TCEQ conducted an investigation of the Service Center location and identified three remaining areas of concern.[3] Goodyear posits that these three areas of concern do not require additional assessment, testing, or remediation because all testing conducted since the removal of the hydraulic lifts in 2008 has shown that there is no contamination at the Service Center location that is at or above any applicable regulatory limits.  Goodyear also states that, although it is willing to work with the TCEQ to address any remaining concerns, Montfort has refused Goodyear

---

[3]Specifically, the TCEQ (1) identified two monitoring wells that were not properly screened across the shallow affected zone and requested that both be replaced and re-sampled; (2) requested the installation of a monitoring well east of an identified potential source of TPH, tetrachloroethylene, and several metals and an assessment of both soil and groundwater for VOCs, TPH, and total metals; and (3) noted spillage in the vicinity of the used oil and new oil ASTs and requested one shallow soil boring north of the new oil AST to determine whether the spills in the area had affected the soil.

access to the Service Center location to complete the cleanup activities under the TCEQ's

PST Program.

B

Montfort filed the instant lawsuit seeking declaratory and injunctive relief and

damages.  It asserts claims under §§ 7002(a)(1)(A) and (B) of the Resource Conservation

and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*; § 107(a) of the Comprehensive

Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607;

and § 361.344 of the Texas Solid Waste Disposal Act ("SWDA"), Tex. Health & Safety

Code Ann. § 361.344 (West 2010).  Montfort also alleges common law claims for breach of

contract, negligence, and nuisance.  It moves for a partial summary judgment that Goodyear

is liable as a "person" responsible for "solid waste," under 42 U.S.C. § 6972(a)(1)(B); that

Goodyear is liable as a "responsible person," under 42 U.S.C. § 9607(a); that Goodyear is

liable as a "person responsible for solid waste," under Tex. Health & Safety Code Ann. §

361.344; that Goodyear failed to comply with Lease provisions that make it responsible for

removal of excavated soils and all contamination at the Shopping Center; and that Goodyear

is liable under the negligence principle *res ipsa loquitur.*

II

Because Montfort will have the burden of proof at trial on its claims (including the issues that are components of these claims), to obtain summary judgment, it "must establish 'beyond peradventure all of the essential elements of the claim[s]'" and issues. *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).  This means that Montfort must demonstrate that there are no genuine and material fact disputes and that it is entitled to summary judgment as a matter of law.  *See*, *e.g.*, *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003).  "The court has noted that the 'beyond peradventure' standard is 'heavy.'"  *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) ( Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

III

The court first considers whether Montfort is entitled to partial summary judgment on its claim under 42 U.S.C. § 6972(a)(1)(B).

A

42 U.S.C. § 6972(a)(1)(B) provides that any person may commence a civil action on his own behalf

> against any person. . . and including any . . . past or present
> owner or operator of a treatment, storage, or disposal facility,
> who has contributed or who is contributing to the past or present
> handling, storage, treatment, transportation, or disposal of any

> solid or hazardous waste which may present an imminent and
> substantial endangerment to health or the environment[.]

The statute vests jurisdiction over § 6972 claims in the district court. *Id.* § 6972(a). And it empowers the court to "restrain any person who has contributed or who is contributing to past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste," to order such person to take other such action as may be necessary, and to apply appropriate civil penalties under § 6928(a) and (g). *Id.*

Montfort seeks partial summary judgment on its § 6972(a)(1)(B) claim, arguing that the term "person" includes corporate entities like Goodyear; that Goodyear's Service Center, storage tanks, and other equipment are "facilities"; that Goodyear "operated" the Service Center, storage tanks, and other equipment; that petroleum-based products and other commercial byproducts are "solid waste" within the meaning of the statute; and that Goodyear handled, stored, and disposed of "solid waste" and byproducts at the Service Center. Goodyear does not dispute these elements of Montfort's RCRA claim. It argues instead that Montfort lacks standing to pursue this claim and that Montfort has failed to establish that the solid waste at issue presents an imminent and substantial endangerment to health or the environment.

B

The court begins by addressing Goodyear's argument that Montfort lacks standing to pursue its RCRA claim. Goodyear maintains that all samples of soil and groundwater taken at the Service Center demonstrate that no chemicals of concern exist at actionable

levels. Accordingly, it posits that there is no imminent or substantial endangerment to health or the environment and that Montfort cannot demonstrate that it has suffered or will suffer any injury in fact as a result of Goodyear's operations at the Service Center.

Although phrased in terms of "standing," the basis of Goodyear's argument is that Montfort cannot prevail *on the merits* of its RCRA claim because there is no evidence to support one element of the claim. "It is inappropriate for the court to focus on the merits of the case when considering the issue of standing." *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1385 (5th Cir. 1986) (citation omitted). And although, as the court later explains, Montfort cannot recover on its RCRA claim if it cannot prove that there is an imminent or substantial endangerment to health or the environment, this fact (if established) would not necessarily mean that Montfort has not suffered an injury in fact. Montfort alleges that it has suffered an injury in fact on the basis that Goodyear contaminated Montfort's property with chemicals and other substances. Accordingly, Montfort has standing to pursue its 42 U.S.C. § 6972(a)(1)(B) claim.

C

The court considers next whether Montfort is entitled to partial summary judgment on this claim. Montfort cites cases that hold that a plaintiff can obtain summary judgment on the issue of liability even though the issue of damages remains to be tried. Montfort moves the court to hold that Goodyear is "*liable* under [42 U.S.C. § 6972(a)(1)(B)] because it is a 'person'; who owned or operated a storage or disposal facility; and at the facility,

Goodyear handled, stored, and disposed of solid waste." P. Br. 12 (emphasis added). But to prove that Goodyear is liable under § 6972(a)(1)(B), Montfort must show the existence of an imminent and substantial endangerment to human health or the environment. *See, e.g.*, *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 211 (2d Cir. 2009) (affirming summary judgment dismissing § 6972(a)(1)(B) claim where plaintiff failed to produce evidence that alleged contamination "'may present an imminent and substantial endangerment to health or the environment.'" (quoting 42 U.S.C. § 6972(a)(1)(B))); *Tilot Oil, LLC v. BP Prods. N. Am., Inc.*, ___ F.Supp.2d___, 2012 WL 124395, at *5 (E.D. Wis. Jan. 17, 2012) (granting summary judgment dismissing RCRA claim where evidence failed to establish that there might be imminent and substantial danger to health or the environment); *Lewis v. FMC Corp.*, 786 F.Supp.2d 690, 708-10 (W.D.N.Y. 2011) (same). Accordingly, Montfort's evidence that Goodyear is a "person," that Goodyear operated a storage or disposal facility, and that Goodyear handled, stored, and disposed of solid waste at the facility is insufficient to establish Goodyear's *liability* under § 6972(a)(1)(B) without evidence that the alleged contamination may present an imminent and substantial endangerment to health or the environment.

Montfort acknowledges the possibility of a fact dispute concerning the issue whether the alleged contamination may present an imminent and substantial endangerment to health or the environment. Because Montfort has failed to meet its heavy summary judgment burden regarding this issue, it is not entitled to partial summary judgment holding that

Goodyear is liable to Montfort under § 6972(a)(1)(B).

D

To the extent Montfort is seeking partial summary judgment on the discrete issues outlined above rather than as to liability on its claim under § 6972(a)(1)(B), the court denies the motion without prejudice.

Although Fed. R. Civ. P. 56(a)[4] permits the court to enter partial summary judgment as to discrete components of a claim, a court "in its discretion in shaping the case for trial, may deny summary judgment as to portions of the case that are ripe therefor, for the purpose of achieving a more orderly or expeditious handling of the entire litigation." *Powell v. Radkins*, 506 F.2d 763, 765 (5th Cir. 1975). The Advisory Committee Note to the recently-revised Rule 56(g) explains that, where the court "cannot grant all the relief requested by the motion, it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial." Rule 56(g) advisory committee's note; *see also* 10B Charles Alan Wright, et al., *Federal Practice and Procedure* § 2737, at 319 (3d ed. 1998) (noting that if "entering a partial summary judgment by identifying the facts that no longer may be disputed would not materially expedite the adjudication, [the court] may decline to do so"). It appears that the narrow issues on which Montfort seeks partial

---

[4]Fed. R. Civ. P. 56(a): "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."

summary judgment regarding its § 6972(a)(1)(B) claim are largely undisputed. The benefits from eliminating these narrow issues by partial summary judgment are outweighed by the efficiency of the court's insisting that the parties stipulate to these undisputed facts. Rule 16(c)(2)(C) provides a mechanism for the court to consider "obtaining admissions and stipulations about facts . . . to avoid unnecessary proof[.]." Because the parties should be able to stipulate to undisputed matters such as whether Goodyear is a "person" under § 6972(a)(1)(B), whether Goodyear operated a storage or disposal facility, and whether Goodyear disposed of solid waste at the facility, it denies this component of Montfort's motion for partial summary judgment. The court will revisit this matter before trial, if necessary, if stipulations are not timely made.

IV

Montfort next seeks summary judgment regarding Goodyear's status as a "responsible person" under § 107(a) of CERCLA, 42 U.S.C. § 9607(a).

Section 107 of CERCLA governs the cleanup of hazardous industrial waste and places the cleanup costs on those who are responsible for the contamination. *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). CERCLA imposes strict liability for environmental contamination on four broad classes of potentially responsible parties ("PRPs"), one of which includes "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). "Once an entity is identified as a PRP, it may

be compelled to clean up a contaminated area or reimburse the Government for its past and future response costs." *Burlington N. & Santa Fe Ry.*, 556 U.S. at 609.

> There are four elements to a CERCLA cost-recovery action, such as the one here: (1) the site must be a "facility" under § 9601(9); (2) the defendant must be a "responsible person" under § 9607(a); (3) a release or threatened release of a hazardous substance must have occurred; and (4) the release or threatened release must have caused the plaintiff to incur response costs.

*Licciardi v. Murphy Oil U.S.A., Inc.*, 111 F.3d 396, 398 (5th Cir. 1997) (citing *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir. 1989)).

Montfort only moves for partial summary judgment as to the first and second elements of its CERCLA claim. It argues that Goodyear is a "person"; that Goodyear allowed "disposals" within the meaning of CERCLA; and that Goodyear "operated" the Service Center, storage tanks, and other equipment, which constituted "facilities" within the meaning of CERCLA. Montfort also posits in a footnote that there are no genuine issues of material fact that the waste that Goodyear disposed of includes several hazardous substances.[5] Goodyear does not dispute that it is a "person," that it allowed "disposals," that the Service Center constituted a "facility," or that it "operated" the Service Center.[6]

---

[5]As an example, Montfort cites evidence that Goodyear used solvent cleaners at the Service Center and that constituents of solvents (such as carbon disulfide and tetrachloroethene, also known as tetrachloroethylene or perchloroethylene) have been found at the Service Center. Montfort argues that both chemicals are "hazardous substances" under CERCLA.

[6]It is unclear whether Montfort intends to move for partial summary judgment on whether the waste Goodyear disposed of constituted a "hazardous substance" within the meaning of CERCLA. Montfort does seek summary judgment on Goodyear's alleged PRP

As with Montfort's RCRA claim, the court concludes that these narrow and undisputed issues should be resolved by stipulation rather than decided by motion for partial summary judgment. Accordingly, the court denies this component of Montfort's motion for partial summary judgment without prejudice. The court will revisit this matter before trial, if necessary, if stipulations are not timely made.

V

Montfort moves for summary judgment on the first and fifth elements of its SWDA claim. It argues that Goodyear is a "person responsible for solid waste" and that it has made

---

status. And to be considered a PRP under § 9607(a)(2), Goodyear must have disposed of a "hazardous substance." 42 U.S.C. § 9607(a)(2). Yet in its reply brief, Montfort states:

> Montfort included footnote 64 in its initial summary judgment brief to demonstrate there *is* evidence Goodyear disposed of substances that qualify as CERCLA "hazardous substances," but Montfort would not move for summary judgment regarding the full range of contaminants actionable under CERCLA because: "There nonetheless may be outstanding issues regarding the character of *other* contaminants at issue. As opposed to asserting piecemeal arguments regarding the 'hazardous' nature of the respective contaminants, Montfort only moves for partial summary judgment regarding Goodyear's status as the 'responsible person.'"

P. Reply Br. 17. Goodyear argues in response that "[s]everal of the materials Montfort alleges were involved in Goodyear's operation at the Service Center are clearly considered petroleum" and thus are subject to the petroleum exception provided in 42 U.S.C. § 9601(14). D. Br. 24. But Goodyear does not appear to dispute that it disposed of solvents containing the chemicals carbon disulfide and tetrachloroethene at the Service Center or that these chemicals are "hazardous substances" under CERCLA. That Goodyear may *also* have disposed of chemicals subject to the petroleum exception does not prevent the court from concluding that Goodyear is a PRP.

- 15 -

reasonable attempts to notify Goodyear of both the release and of Montfort's intent to take steps to eliminate the release.

## A

The SWDA is the Texas counterpart to CERCLA. *R.R. Street & Co. v. Pilgrim Enters., Inc.*, 166 S.W.3d 232, 238 (Tex. 2005). Like CERCLA, the SWDA contains a provision that permits private parties to bring contribution actions against other potentially responsible parties. *See id.* Under that provision,

> [a] person who conducts a removal or remedial action that is approved by the [TCEQ] and is necessary to address a release or threatened release may bring suit in a district court to recover the reasonable and necessary costs of that action and other costs as the court, in its discretion, considers reasonable.

Tex. Health & Safety Code Ann. § 361.344(a). To establish a claim under the SWDA, a plaintiff must prove:

> (1) the defendant is a "person responsible for solid waste" as defined in section 361.271; (2) the TNRCC approved the plaintiff's removal or remedial action; (3) the action was necessary to address a release or threatened release of solid waste; (4) the costs of the action were reasonable and necessary; and (5) the plaintiff made reasonable attempts to notify the defendant of both the release and the plaintiff's intent to take steps to eliminate the release.

*R.R. Street & Co.*, 166 S.W.3d at 240 (citing Tex. Health & Safety Code § 361.344).

## B

For the reasons stated above, the court denies Montfort's motion for summary judgment as to the first element and directs the parties to stipulate as to the undisputed facts,

- 16 -

including whether Goodyear is a "person responsible for solid waste" under the SWDA.

C

On the disputed issue of notice, the court holds that Montfort has established beyond peradventure that it made reasonable attempts to notify Goodyear of the release of solid waste and of Montfort's intent to take steps to eliminate the release. The SWDA requires that "the person seeking cost recovery must have made reasonable attempts to notify the person against whom cost recovery is sought (1) of the existence of the release or threatened release and (2) that the person seeking cost recovery intended to take steps to eliminate the release or threatened release." Tex. Health & Safety Code Ann. § 361.344(c). In a March 5, 2010 letter, Montfort informed Goodyear, *inter alia*, that "[t]here have been documented releases of contaminants at the [Service Center] attributable to Goodyear's operations." P. App. 103. Montfort provided detail as to the specific contaminants that had been discovered and the dates of discovery. On April 1, 2011[7] Montfort sent Goodyear a second letter, informing Goodyear that it "intend[ed] to undertake a response at the site to accomplish [a full investigation of the contamination at the property] and assure measures to evaluate and remediate these releases in accordance with the [TCEQ] rules and regulations is performed." *Id*. at 118. Although Goodyear disputes that Montfort's letters constituted notice under the SWDA, it has failed to provide any basis other than its assertion that "Montfort's purported

_____

[7]Although Montfort filed its complaint on August 25, 2010, it did not assert a claim under the SWDA until it filed its amended complaint on August 23, 2011, four months after it sent the April 1, 2011 notice letter.

provision of a notice letter to Goodyear under the SWDA borders on the ludicrous in this case." D. Br. 31.  The court holds that Montfort has established beyond peradventure that, in connection with its SWDA claim, it made reasonable attempts to notify Goodyear of both the release and of Montfort's intent to take steps to eliminate the release.  Accordingly, the court grants partial summary judgment as to the notice element of Montfort's SWDA claim.[8]

## VI

Montfort also moves for summary judgment on its breach of contract claim.

## A

Under Texas law, to establish its breach of contract claim, Montfort must prove four elements: (1) the existence of a valid contract; (2) that Montfort performed its duties under the contract; (3) that Goodyear breached the contract; and (4) that Montfort suffered damages as a result of the breach.  *See, e.g., Lewis v. Bank of Am. NA*, 343 F.3d 540, 544-45 (5th Cir. 2003) (Texas law).  Montfort only moves for summary judgment as to the third element, arguing that Goodyear breached the Lease by leaving contamination at the Shopping Center and by failing to remove excavated soil.

## B

Montfort argues that Goodyear breached the Lease by leaving contamination on the

---

[8]Because Goodyear disputes this element of Montfort's SWDA claim, the court addresses Montfort's motion for partial summary judgment as to this issue.

Shopping Center property. Section 5.13 of the 1994 Lease Amendment[9] provides, under the heading "Surrender of property," that "[u]pon surrender of the Demised Premises or termination of the Lease, . . . [Goodyear] shall . . . leave no contamination from its use and occupancy of the Demised Premises." P. App. 91. Under Montfort's interpretation of § 5.13, "under no circumstance is Goodyear allowed to leave contamination, of any kind, at the Shopping Center now that Goodyear has ceased operating at the Shopping Center." P. Br. 20-21.

Goodyear does not challenge Montfort's evidence that contamination has been detected at the Shopping Center since Goodyear ceased operations. Instead, it points to a different provision of the 1994 Lease Amendment and argues that it was only required to clean the property to within applicable governmental and regulatory limits. Goodyear relies on § 5.15, entitled "Clean up standard," which provides: "No spill, discharge or release of hazardous substances is permitted on the Demised Premises. In the event any spill, discharge or release nonetheless occurs, [Goodyear] shall clean up and remove all contamination to meet applicable standards of relevant governmental authorities or under applicable environmental laws." P. App. 91-92. Goodyear argues that § 5.15 is the standard by which the Lease determines whether, under § 5.13, any contamination has been left behind. Goodyear maintains that this is the logical reading because the lessor would not be subject to any governmental penalty or clean up obligation concerning the premises if any

---

[9]Because Goodyear does not dispute that this provision is controlling, the court assumes that the terms of the 1994 Lease Amendment control in this respect.

contamination had already been cleaned to within applicable limits.  Goodyear maintains it has not breached the Lease because it has remediated any contamination to within the limits established by the TCEQ.

C

"Under Texas law, the court's primary concern when interpreting a contract is to ascertain the parties' intentions as expressed objectively in the contract."  *Hoffman v. L & M Arts*, 774 F.Supp.2d 826, 832 (N.D. Tex. 2011) (Fitzwater, C.J.).  "When the provisions of a contract appear to conflict, [the court] will attempt to harmonize the two provisions and assume the parties intended every provision to have some effect."  *United Protective Servs., Inc. v. W. Village Ltd. P'ship*, 180 S.W.3d 430, 432 (Tex. App. 2005, no pet.) (citing *Edlund v. Bounds*, 842 S.W.2d 719, 726 (Tex. App. 1992, writ denied)).  If the court is "unable to harmonize the provisions and give effect to all clauses, and the contract is susceptible to more than one reasonable interpretation, [the court] will find the contract is ambiguous."  *Id.* (citing *Royal Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 347 (Tex. App. 2004, pet. denied)).

The court holds that these two sections can be harmonized so that each controls in the proper context.  Section 5.13 of the 1994 Lease Amendment specifies Goodyear's obligations at the time it surrenders the Service Center property or terminates the Lease.  When this occurs, Goodyear is prohibited under § 5.13 from leaving any contamination on the premises.  In contrast, § 5.15 applies when any spill, discharge or release actually occurs,

- 20 -

but before Goodyear surrenders the Service Center property or terminates the Lease. Although under § 5.15 no such spill, discharge, or release of hazardous substances is permitted on the Service Center property, if one does occur, Goodyear must "clean up and remove all contamination to meet applicable standards of relevant governmental authorities or under applicable environmental laws." P. App. 91-92.  Therefore, §§ 5.13 and 5.15 can be read together to refer to two different contexts.  Section 5.13 governs at the time Goodyear surrenders the Service Center property or terminates the Lease.  Section 5.15 governs at the time a spill, discharge, or release of a hazardous substance actually occurs. This means that, under the Lease, during the period when Goodyear was the lessee, if Goodyear spilled, discharged, or released any hazardous substance, it was only responsible for cleaning up and removing the contamination to the level required by "applicable standards of relevant governmental authorities or under applicable environmental laws." *Id.* If the applicable standards and environmental laws permitted certain amounts of contamination in the soil and groundwater, Goodyear was not required to remove all contamination.  But upon surrendering the Service Center property or terminating the Lease, Goodyear could not leave any contamination on the property, even if the applicable standards and environmental laws would permit some level of contamination.

Having concluded as a matter of law that the Lease prohibits Goodyear from leaving any contamination on surrendering the Service Center property or terminating the Lease, the court holds that Montfort has established beyond peradventure that Goodyear breached the

Lease on this basis.

D

The court next considers whether Goodyear breached the Lease by failing to remove excavated soil. Section 5.17 of the 1994 Lease Amendment provides, in pertinent part, that "[w]ith respect to the remediation undertaken by [Goodyear], it is agreed that [Goodyear] will haul off and dispose of all dirt, whether contaminated or not that has been removed, in a proper and lawful manner, complying with all laws, ordinances, rules and regulations of all governmental authorities." P. App. 92. Montfort argues that this provision required Goodyear to "haul off and dispose of" all the soil that Goodyear had excavated, regardless whether the soil was contaminated. It relies on the affidavit of Stanley M. Peskind ("Peskind"), Manager of the general partner of Montfort, to establish that when Goodyear excavated soil surrounding the location of the hydraulic lifts and corresponding storage tanks in 2008, it did not remove the excavated soil. According to Peskind, Goodyear instead returned the soil to the ground near the service bays where the hydraulic lifts had been located.

Goodyear does not dispute that it excavated soil in 2008 or that it failed to "haul off and dispose of" soil that it had excavated. It argues instead that the word "removed" in the 1994 Lease Amendment refers only to soil that has been excavated and removed from the premises. In other words, Goodyear maintains that its obligation to dispose of this soil arises only after the excavated soil has been removed from the premises. Goodyear posits that if

the soil has been excavated but not removed from the Service Center premises, it is not prohibited from returning the soil to the place from which it was excavated.

In interpreting a contract, the court must "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Bank One, Tex., N.A. v. FDIC*, 16 F.Supp.2d 698, 707 (N.D. Tex. 1998) (Fitzwater, J.) (Texas law). Goodyear in effect reads § 5.17 to say that, only if during remediation Goodyear completely removes dirt from the Service Center premises is it required to haul off and dispose of the dirt in a proper and lawful manner, complying with all laws, ordinances, rules, and governmental regulations. The court disagrees for two reasons with this interpretation of § 5.17.

First, it renders the term "haul off" superfluous. If soil has been completely removed from the premises, there is still a need *to dispose* of the soil, but there is no need *to haul off* that soil because it has already been removed from the premises.

Second, Goodyear's reading of § 5.17 renders it superfluous. Section 5.15 imposes a "Clean up standard" that prevents Goodyear from retaining on the premises dirt that is contaminated at levels above applicable standards and environmental laws. *See* P. App. 91-92 (requiring Goodyear to "clean up *and remove* all contamination to meet applicable standards of relevant governmental authorities or under applicable environmental laws" (emphasis added)). In order for § 5.17 not to be rendered superfluous, it must place on Goodyear an obligation that § 5.15 does not already impose. Section 5.17 does impose such

- 23 -

an additional obligation: with respect to remediation involving dirt, it requires not only that Goodyear comply with applicable governmental standards and environmental laws, but that Goodyear haul off and dispose of all dirt "*whether contaminated or not*" involved in remediation.  Section 5.17 is not superfluous when § 5.15 is interpreted as setting forth the general "clean up standard" for remediation and § 5.17 is interpreted as prescribing a higher standard when remediation involves dirt removal.  Therefore, properly interpreted, § 5.17 requires that, if remediation involves the removal of dirt, Goodyear is obligated to haul off and dispose of all dirt—whether contaminated or not—involved in the remediation.  In failing to do so, Goodyear breached this provision of the Lease.

Accordingly, the court grants partial summary judgment on the third element of Montfort's breach of contract claim and holds that Montfort has established beyond peradventure that Goodyear breached the Lease on this basis.

## E

Although the court holds Montfort has established the breach element of its breach of contract claims based on Goodyear's leaving contamination at the Shopping Center and failing to remove excavated soil, the partial summary judgment granted today is limited. Montfort has neither moved for summary judgment on the entirety of its breach of contract claims nor presented any evidence that, as a result of Goodyear's breaches of contract, it has suffered damages.  Unless Montfort can prove the elements of causation and damages, it cannot recover from Goodyear on its breach of contract claim.

VII

Finally, the court turns to Montfort's negligence claim.  Montfort argues that because the releases of contaminants "of the kind at issue [here] should not occur in the absence of negligence," and because only Goodyear managed and controlled the storage tanks and other equipment at the Storage Center, Montfort is entitled to summary judgment on its negligence claim.  P. Br. 22.

Under Texas law, the "elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). Montfort has pleaded *res ipsa loquitur*, "which is simply a rule of evidence by which negligence can be inferred by the jury." *Jones v. Tarrant Util. Co.*, 638 S.W.2d 862, 865 (Tex. 1982).

> The purpose of *res ipsa* is to relieve the plaintiff of the burden of proving a specific act of negligence by the defendant when it is impossible for the plaintiff to determine the sequence of events, or when the defendant has superior knowledge or means of information to determine the cause of the accident.

*Id.* (citing *Mobil Chem. Co. v. Bell*, 517 S.W.2d 245 (Tex. 1974)).  The doctrine "is applicable only when: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence; and (2) the instrumentality causing the injury is shown to be under the management and control of the defendant." *Id.* (citing *Marathon Oil Co. v. Sterner*, 632 S.W.2d 571 (Tex. 1982)).

- 25 -

Montfort generally alleges that "releases of the kind at issue [here] should not occur in the absence of negligence," P. Br. 22, but it has failed to meet the heavy "beyond peradventure" standard.  Although it is possible (and the trier of fact may find it probable) that the chemical releases at the Service Center were the result of Goodyear's negligence, Montfort has not shown that beyond doubt the character of the accident is such that it would not ordinarily occur in the absence of negligence.  *See*, *e.g.*, *Pearson v. BP Prods. N. Am., Inc.*, 449 Fed. Appx. 389, 392 (5th Cir. 2011) (per curiam) (holding in case against oil company to recover damages for personal injuries allegedly resulting from exposure to carbon disulfide that district court should not have instructed jury on *res ipsa loquitur* where plaintiffs failed to show that the character of the accident is one that would not usually occur absent negligence); *Marathon Oil Co.*, 632 S.W.2d at 573 (holding that *res ipsa loquitur* jury instruction was inappropriate because "[e]scaping gas in the vicinity of a complex chemical plant could be due to an unexpected and unforeseeable mechanical failure or it could be due to negligence" (citation omitted)).[10]

---

[10]Montfort argues that, under Texas law, there is no requirement that it adduce "testimony or evidence regarding the possibility of releases in the absence of negligence." P. Br. 22 (citing *Jones*, 638 S.W.2d at 865).  But under Texas law, the first *res ipsa loquitur* factor must be proved either by expert testimony or by general knowledge that the accident would not ordinarily occur in the absence of negligence.  *See Mobil Chem. Co.*, 517 S.W.2d at 252.  Accordingly, a plaintiff who chooses to forgo expert testimony must establish that it is generally known that the accident would not ordinarily occur in the absence of negligence.  *E.g.*, *Carlson v. Remington Hotel Corp.*, 2008 WL 2186449, at *3 (Tex. App. May 22, 2008, no pet.) (mem. op.) ("Because appellants had no expert testimony, they needed to show that it is generally known that carpet adjacent to a bathroom would not become wet in the absence of negligence. We are aware of no such general knowledge, and appellant has not shown that proposition to be true."); *see also Lynch v. Noram Energy*

Because Montfort has not established beyond peradventure that the doctrine of *res ipsa loquitur* applies and has not made any attempt to adduce evidence on the other elements of its negligence claim, the court denies Montfort's motion for summary judgment on this claim.

\*   \*   \*

For the foregoing reasons, the court grants in part and denies in part Montfort's motion for partial summary judgment.

**SO ORDERED.**

June 21, 2012.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

---

*Corp.*, 2000 WL 708419, at \*5 (Tex. App. May 30, 2000, pet. denied) (mem. op.) ("To rely on the doctrine [of *res ipsa loquitur*], the plaintiff must produce evidence from which the jury can conclude, by a preponderance of the evidence, that both factors are present."). Montfort has failed to make this showing.